

# SUPREME COURT OF MISSOURI
## en banc

JOHN HENRY RHODEN and )    *Opinion issued March 2, 2021*
DOROTHY JEAN WINFIELD, )
  )
Respondents, )
  )
v. ) No. SC98327
  )
MISSOURI DELTA MEDICAL CENTER, )
  )
Appellant. )

**APPEAL FROM THE CIRCUIT COURT OF SCOTT COUNTY**
The Honorable David A. Dolan, Judge

John Henry Rhoden and Dorothy Jean Winfield (hereinafter and collectively, "Plaintiffs"), as family representatives, filed suit against Missouri Delta Medical Center (hereinafter, "MDMC") for the wrongful death of their father, Roosevelt Rhoden (hereinafter, "Decedent"). Plaintiffs claim the negligent care MDMC and two physicians it employed provided caused Decedent's death. Following a trial, the jury returned a verdict in Plaintiffs' favor and awarded $269,780.80 for economic damages, $300,000 for noneconomic damages, and $300,000 for aggravating circumstances damages. The

circuit court entered judgment, and MDMC appeals. This Court finds no error occurred. Accordingly, the circuit court's judgment is affirmed.[1]

## Background

Decedent was receiving ongoing care from MDMC and its doctors, Dr. Linza Killion (hereinafter, "Dr. Killion") and Dr. Kevin Rankin (hereinafter, "Dr. Rankin"), for prostate issues. Decedent was in his late seventies and had numerous health issues, including, obesity, hypertension, and insulin-dependent diabetes. Decedent also suffered from chronic kidney disease and respiratory issues.

For years, Decedent's prostrate issues were treated with medication. In September 2012, Decedent noted he felt his urine force was not as strong as he would like and felt as if he could not vacate his bladder fully. Decedent could urinate and had no issue with incontinence or post-void dribbling. Without waiting to determine whether any change in medication would treat Decedent's concerns, Dr. Killion informed Decedent his only treatment options were surgery or self-administering a catheter for the remainder of his life. Decedent opted for surgery, and Dr. Killion performed a transurethral resection of the prostate (hereinafter, "TURP") and a transurethral incision of the bladder neck (hereinafter, "TUIBN").

---

[1] This Court has jurisdiction under article V, section 10 of the Missouri Constitution because it granted transfer after opinion by the Missouri Court of Appeals, Southern District.

Following surgery, Decedent's recovery did not proceed as expected.  He suffered from multiple complications and later died.  Plaintiffs filed a wrongful death action against MDMC, raising issues related to Decedent's need for surgery and the quality of his post-surgical care, which led to his death.  The jury returned its verdict in Plaintiffs' favor.  MDMC appeals.

**Aggravating Circumstances Damages**

MDMC claims there was not substantial evidence to support the circuit court submitting the issue of aggravating circumstances damages to the jury.  MDMC asserts the claim for additional damages was not supported by clear and convincing evidence that the health care providers demonstrated willful, wanton, or malicious conduct.

*Preservation of error*

Initially, this Court must determine whether MDMC preserved its claim of error regarding whether there was not substantial evidence to support an instruction with aggravating circumstances damages for appellate review.  "A submissibility-of-the-claim challenge is an attempt to have a claim outright disposed of and, therefore, must be raised in a motion for directed verdict and renewed in a motion for judgment notwithstanding the verdict." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 850 n.3 (Mo. banc 2018).

To preserve the issue of submissiblity in a jury-tried case, a party must file a directed verdict motion and a motion for judgment notwithstanding the verdict (hereinafter, "JNOV") should there be an adverse verdict.  *Heifetz v. Apex Clayton, Inc.*,

3

554 S.W.3d 389, 395 (Mo. banc 2018). Rule 72.01 governs motions for directed verdict and JNOV.

A party has two opportunities to file a directed verdict motion. The first is "at the close of the evidence offered by an opponent." Rule 72.01(a). Any directed verdict motion is required to "state the specific grounds therefor." *Id.* Because the directed verdict motion must be presented during trial, there is no requirement the directed verdict motion must be written. *See* Rule 55.26(a). This Court long has preferred a written directed verdict motion be filed rather than rely upon an oral motion. *Manley v. Horton*, 414 S.W.2d 254, 258 (Mo. 1967). If this motion is overruled, the moving party may elect to either rest or present additional evidence.

If the moving party elects to present additional evidence, the claim that the circuit court erred in overruling the directed verdict motion at the close of the plaintiff's evidence is waived. *Schnatzmeyer v. Nat'l Life Ins. Co.*, 791 S.W.2d 815, 819 (Mo. App. E.D. 1990). Accordingly, there must be another directed verdict motion filed at the close of all of the evidence to challenge the submissibility of the plaintiff's case. Rule 72.01(b). While the motion must be specific, the standard for specificity in a challenge to submissibility raised in a motion for directed verdict "is not a demanding one." *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 654 (Mo. banc 2019).[2] Provided a directed verdict motion was submitted at the close of all of the evidence and

---

[2] In *Wadlow v. Lindner Homes, Inc.*, 722 S.W.2d 621, 633 (Mo. App. E.D. 1986), and *Reed v. Curators of University of Missouri,* 509 S.W.3d 816, 827 (Mo. App. W.D. 2016), the appellate court found that, while the written directed verdict motions lacked specificity, when combined with the arguments of counsel, the motions were sufficient.

4

the motion is overruled, that party may file a motion for JNOV. *Id.* "Issues not raised in a motion for directed verdict, but raised in the motion for JNOV, are not preserved for appellate review of the motion for JNOV." *Holmes v. Kan. City Pub. Sch. Dist.*, 571 S.W.3d 602, 612 (Mo. App. W.D. 2018) (quoting *Wolf v. Midwest Nephrology Consultants, PC.*, 487 S.W.3d 78, 83 (Mo. App. W.D. 2016)).

MDMC filed a written directed verdict motion at the close of all of the evidence. In addition to the written directed verdict motion, MDMC's counsel orally argued its position.

Plaintiffs' counsel and the circuit court then engaged in a discussion. At the conclusion of their discussion, the circuit court stated, "I overruled the directed verdict motion at the close of all of the evidence." The complete record reflects both counsel and the circuit court were apprised fully of MDMC's basis for challenging submissibility. Accordingly, the undemanding specificity requirement of Rule 72.01 was satisfied.

*Submissibility of the claim*

"The standard of review for failures to sustain motions for directed verdict and for JNOV is essentially the same." *Robinson v. Langenbach*, 599 S.W.3d 167, 176 (Mo. banc 2020) (quoting *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 95 (Mo. banc 2010)). "This Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability." *Id.*

"Whether there is sufficient evidence to support an award of punitive damages is a question of law, and this Court's review is *de novo*." *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 520 (Mo. banc 2009). In determining whether a claim is submissible, this

5

Court views the evidence and all reasonable inferences therefrom in the light most favorable to the jury's verdict. *Laughlin v. Perry*, 604 S.W.3d 621, 625 (Mo. banc 2020). Any adverse evidence and inferences are disregarded. *Darks v. Jackson Cnty.*, 601 S.W.3d 247, 259 (Mo. App. W.D. 2020). "Only evidence that tends to support the submission should be considered." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 401 (Mo. App. E.D. 2014).

When seeking punitive damages against a health care provider in a medical malpractice case, an award "shall be made only upon a showing by a plaintiff that the health care provider demonstrated willful, wanton or malicious misconduct with respect to his [or her] actions which are found to have injured or caused or contributed to cause the damages claimed in the petition." Section 538.210.8, RSMo Supp. 2017.[3] "For purposes of punitive damages, acting willfully, wantonly, or maliciously is equivalent to acting with a complete indifference to or in conscious disregard for the rights or safety of others." *Bell v. Redjal*, 569 S.W.3d 70, 89 (Mo. App. E.D. 2019); *see also Koon v. Walden*, 539 S.W.3d 752, 772 (Mo. App. E.D. 2017).

Viewing the evidence in the light most favorable to the jury's verdict, it is clear Plaintiffs made a submissible case for aggravated circumstances damages because there was complete indifference to or conscious disregard for Decedent's safety.[4] When

---

[3] All further statutory references to this section are to RSMo Supp. 2017 unless otherwise noted. Additionally, this section previously was denominated as section 538.210.5 at the time of Decedent's death in 2013 and then denominated as section 538.210.6 in a 2015 amendment.

[4] The standards for determining whether a health care provider may be subject to punitive damages have been amended. Section 538.210.8, RSMo Supp. 2020, now states:

Decedent reported mild prostate issues, he was not suffering from a health emergency. Dr. Killion knowingly and incorrectly informed Decedent the only two treatment options were surgery or to self-catheterize for the remainder of his life. Dr. Killion knew there were other non-invasive treatment options, including a transurethral microwave treatment or use of different medications.[5] These treatments could have addressed Decedent's concerns, especially in light of the fact Decedent was at high risk for surgery. Dr. Killion also negligently resected too much prostate during the TURP surgery and, to remedy his

---

> Any provision of law or court rule to the contrary notwithstanding, an award of punitive damages against a health care provider governed by the provisions of sections 538.205 to 538.230 shall be made only upon a finding by the jury that the evidence clearly and convincingly demonstrated that the health care provider intentionally caused damage to the plaintiff or demonstrated malicious misconduct that caused damage to the plaintiff. Evidence of negligence including, but not limited to, indifference to or conscious disregard for the safety of others shall not constitute intentional conduct or malicious misconduct.

This subsequent amendment supports the position that MDMC's conscious disregard for Decedent's life does not rise to the level of aggravating damages. The legislature's subsequent amendment is instructional as to the applicable statutory meaning. *Mo. State Conference of NAACP v. State*, 607 S.W.3d 728, 734 (Mo. banc 2020). "Accordingly, when the legislature amends a statute, we presume the legislature intended to change the existing law." *D.E.G. v. Juvenile Officer of Jackson Cnty.*, 601 S.W.3d 212, 216 (Mo. banc 2020). The legislature's purposeful amendment of section 538.210.8 to exclude conscious disregard for another's safety as a means to demonstrate punitive damages, indicates the legislature knew that, prior to the amendment, a healthcare provider could be liable for punitive damages by consciously disregarding another's safety. MDMC's conscious disregard for failing to inform Decedent of known, safe, and less-invasive treatment options as well as disregarding information and testing that could have prevented his death amounted to a conscious disregard for Decedent's safety. While these actions may not be sufficient to trigger punitive damage liability under the revised statute, it was sufficient at the time these actions and decisions affecting Decedent were made.

[5] Dr. Killion also testified a transurethral needle ablation procedure was another treatment option but it was not "available here."

error, he had to conduct the additional TUIBN surgery, which he knew increased the risk of bladder perforation. Dr. Killion's misplacement of the catheter and failure to recognize his error fell below the standard of care.

The events that occurred after breaching the standard of care form the basis for demonstrating aggravated circumstances damages were supported by the evidence. Rather than following the normal course of recovery, Decedent suffered severe abdominal pain immediately after his surgery. This pain indicated something was seriously wrong and needed to be investigated, but it was not. The day after the surgery, Decedent's severe abdominal pain continued. Decedent had difficulty breathing, was experiencing kidney failure, and was showing signs of sepsis. Two days after the surgery, Decedent was in major organ failure, requiring dialysis and a ventilator.

Expert testimony, including from Dr. Killion, established that if a patient is doing poorly post-operatively, the possibility that something wrong happened during the surgery must be investigated. However, there was no investigation into the root cause of Decedent's severe post-operative pain. Neither Dr. Killion nor Dr. Rankin performed any test to determine whether the bladder was perforated or the catheter was outside of the bladder. Yet, Dr. Killion wrote Decedent's post-operative report asserting Decedent tolerated the procedure well and his care "will be managed in the usual fashion." Dr. Killion testified there were at least three other non-invasive tests that could have been administered that would have revealed whether the catheter was misplaced.

Due to Decedent's declining health, another physician ordered X-rays be taken of Decedent's chest and abdomen. The X-rays revealed the presence of "free air" and

8

concluded it was "likely post-surgical in nature." This discovery was so significant the radiologist called Dr. Killion to communicate the results because the situation required immediate treatment. Again, no further steps were taken to determine whether the catheter was misplaced.

Dr. Killion and Dr. Rankin ignored further warnings from another physician, who stated Decedent had a urine leak caused by a perforated bladder. Dr. Killion knew Decedent suffered acute kidney failure immediately after the TURP surgery and that acute kidney failure was consistent with a bladder perforation. Yet, Dr. Killion discounted any possibility that he made a surgical mistake and refused to perform any diagnostic testing.

Dr. Rankin also was aware of "free air" that could have been related to the surgery. Dr. Rankin suspected the cause was a perforated duodenal ulcer, which required treatment within six hours of the perforation to limit the severity of complications. Yet, Dr. Rankin did not write his report until more than six hours after his diagnosis. Dr. Rankin also knew there was less invasive testing available, but instead he performed an exploratory laparotomy on Decedent. Although Decedent's records indicated a possible urine leak, Dr. Rankin failed to read Decedent's records prior to conducting his surgery. Had Dr. Rankin known about the urine leak, he would have proceeded differently with Decedent's care.

Eventually, Decedent was transferred to another hospital and arrived on November 7, 2012. The first test upon Decedent's arrival was an abdominal and pelvic CT scan, which showed the catheter outside of his bladder and a large collection of fluid believed

9

to be urine.  These physicians removed the existing catheter and replaced it with a properly positioned one.  Decedent's condition improved, but, due to the extensive trauma caused by his treatment and procedures at MDMC, Decedent was unable to recover.

Plaintiffs submitted substantial evidence to support the submission of an aggravating circumstances damages to the jury.  This point is denied.

### Instructional error

MDMC claims the circuit court erred in submitting the instruction for aggravating circumstances damages because it misstated the law.  MDMC asserts section 538.210.8 provides the standard for punitive damages in a medical negligence case as "willful, wanton or malicious."  However, the instruction submitted to the jury was patterned upon the MAI instruction, which permitted the jury to find a "complete indifference to or conscious disregard for the safety of others."

"Counsel shall make specific objections to instructions considered erroneous.  No party may assign as error the giving or failure to give instructions unless that party objects thereto on the record during the instructions conference, stating distinctly the matter objected to and the grounds of the objection."  Rule 70.03.  Additionally, the same objection must be raised in a new trial motion.  *Id*.  "Timely objections [to an instruction] are required as a condition precedent to appellate review."  *Ross-Paige v. Saint Louis Metro. Police Dep't*, 492 S.W.3d 164, 170 (Mo. banc 2016) (alteration in original) (quoting *Gomez v. Constr. Design, Inc.*, 126 S.W.3d 366, 371 (Mo. banc 2004)).

At the instruction conference, with regard to the aggravating circumstances instruction, MDMC's counsel stated, "I object to the submission of punitive damages or aggravating circumstance and particularly with the standard of conscious disregard to the jury." The circuit court overruled this objection, and a discussion of verdict forms commenced.

In its new trial motion, MDMC stated it believed the instruction used the improper standard because section 538.210.8 requires the use of "willful, wanton, or malicious." MDMC explained, although the instruction used the applicable MAI language, MDMC believed that, since 2006, the applicable standard in section 538.210.8 is "willful, wanton, or malicious." Accordingly, MDMC believed the applicable MAI stated the incorrect law and should not have been used. While MDMC did not fully articulate its concerns prior to the instructions conference and did not offer alternative language or submit an alternative instruction for the circuit court's consideration, the circuit court was appraised fully of MDMC's argument, and it was preserved for review.

MDMC claims the instruction, which was patterned upon the applicable MAI, was improper because it failed to comply with the standards in section 538.210.8. When there is a MAI instruction applicable to a particular case, the use of that MAI instruction is mandatory. Rule 70.02(b). "An instruction must be a correct statement of law." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 857 (Mo. banc 2018) (quoting *Spring v. Kan. City Area Transp. Auth.*, 873 S.W.2d 224, 226 (Mo. banc 1994)). "If a particular MAI does not state the substantive law accurately, it should not be given." *Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 159 (Mo. banc 2012).

11

Since its enactment in 1986, section 538.210 has provided punitive damages are available in a medical negligence case when there is proof of "willful, wanton, or malicious misconduct." Chapter 538 does not define the terms "willful," "wanton," or "malicious."

"The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Lin v. Ellis*, 594 S.W.3d 238, 241-42 (Mo. banc 2020) (quoting *Farmers' & Laborers' Co-op Ins. Ass'n v. Dir. of Revenue*, 742 S.W.2d 141, 145 (Mo. banc 1987)). "Absent express definition, statutory language is given its plain and ordinary meaning, as typically found in the dictionary." *Dickemann v. Costco Wholesale Corp.*, 550 S.W.3d 65, 68 (Mo. banc 2018) (quoting *State v. Brookside Nursing Ctr., Inc.*, 50 S.W.3d 273, 276 (Mo. banc 2001)). "When the legislature enacts a statute referring to terms that have had other judicial or legislative meaning attached to them, the legislature is presumed to have acted with knowledge of that judicial or legislative action." *Cook Tractor Co. v. Dir. of Revenue*, 187 S.W.3d 870, 873 (Mo. banc 2006).

Webster's Third New International Dictionary defines "wanton" as: "marked by or manifesting heedless disregard of justice or the rights, safety, and feelings of others … having no just foundations or real provocation: willfully malicious." Webster's Third New Int'l Dictionary 2575 (Unabridged 2002). Similarly, Black's Law Dictionary defines "wanton" as "recklessly disregardful of the rights or safety or others …." Black's Law Dictionary 1582 (6th ed. 1990).

12

These dictionary definitions are consistent with this Court's interpretation, recognizing the culpable mental state of "wanton" encompasses a complete indifference or conscious disregard standard. "These terms are so conceptually similar that they have--before and after promulgation of the MAIs and enactment of the statute--frequently been used interchangeably in myriad contexts …." *Koon*, 539 S.W.3d at 772. As early as 1921, this Court recognized the words "willful, wanton, and reckless" are included in the meaning of "conscious disregard of the life and bodily safety." *Evans v. Ill. Cent. R. Co.*, 233 S.W. 397, 400 (Mo. banc 1921). In *Nichols v. Bresnahan*, 212 S.W.2d 570, 573 (Mo. 1948), this Court again recognized a willful, wanton, or reckless injury is "based upon an act done in utter disregard of the consequences." "To constitute an act wanton, the party doing the act or failing to act must be conscious of his conduct, and … must be conscious, from his knowledge of the surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury." *Boehrer v. Thompson*, 222 S.W.2d 97, 100 (Mo. 1949); *see also Stewart v. Farley*, 269 S.W.2d 896, 898 (Mo. 1954).

More recent cases also recognize "wanton" is "a knowing and conscious disregard of the right or the welfare of another." *Ryburn v. Gen. Heating & Cooling, Co.*, 887 S.W.2d 604, 609 (Mo. App. W.D. 1994); *Meyer v. Purcell*, 405 S.W.3d 572, 575-76 (Mo. App. E.D. 2013). These cases instruct the statutory wanton misconduct standard required for punitive damages is satisfied by proof that meets the MAI "complete indifference" and "conscious disregard" standard.

"A submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted 'either by a wanton, willful or outrageous act, or

13

reckless disregard for an act's consequences (from which evil motive is inferred).'"

*Howard v. City of Kan. City*, 332 S.W.3d 772, 788 (Mo. banc 2011) (quoting

*Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633, 635 (Mo. banc 2004)); *Smith v.*

*Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 630 (Mo. banc 2013).  To meet

the "willful, wanton or malicious" culpable mental state required for punitive damages, a

plaintiff can demonstrate "the defendant showed a complete indifference to or conscious

disregard for the safety of others."  *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 714

(Mo. App. E.D. 2020); *Poage v. Crane Co.*, 523 S.W.3d 496, 515 (Mo. App. E.D. 2017);

*Blanks v. Fluor Corp.*, 450 S.W.3d 308, 400 (Mo. App. E.D. 2014).

Further, following the enactment of section 538.210, Missouri courts continued to

recognize wanton misconduct as a proxy for "complete indifference" and "conscious

disregard."  "For purposes of punitive damages, acting willfully, wantonly, or

maliciously is equivalent to acting with a complete indifference to or in conscious

disregard for the rights or safety of others."  *Redjal*, 569 S.W.3d at 89; *see also Koon*,

539 S.W.3d at 769.

Because the instruction's standard of "complete indifference to or conscious

disregard for the safety of others" and section 538.210.8's standard of "willful, wanton or

malicious" are not in conflict, the instruction properly was submitted to the jury.  There is

no actual conflict between the instruction and the substantive law.  This point is denied.

### "But for" Causation

MDMC complains Plaintiffs failed to make a submissible case because they failed

to establish "but for" causation.  MDMC asserts the circuit court erred in submitting

Verdicts A and B to the jury because Plaintiffs failed to present evidence that Dr. Killion or Dr. Rankin's alleged negligence caused Decedent to die when he did.[6]

To make a submissible case, "a plaintiff must present substantial evidence for every fact essential to liability." *Watson v. Tenet Healthsystem SL, Inc.*, 304 S.W.3d 236, 240 (Mo. App. E.D. 2009) (quoting *Wicklund v. Handoyo*, 181 S.W.3d 143, 147 (Mo. App. E.D. 2005)). "In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456-57 (Mo. banc 2006); *see also Huelskamp v. Patients First Health Care, LLC*, 475 S.W.3d 162, 168 (Mo. App. E.D. 2014). "The jury's verdict will be reversed only if there is a complete absence of probative facts to support the jury's conclusion." *Keveney v. Mo. Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010).

Plaintiffs must establish that "but for" MDMC's conduct, Decedent would not have died. *Sanders*, 364 S.W.3d at 209. "But-for causation is also known as 'causation in fact.'" *Id*. "To prove causation in fact in a wrongful death action, a plaintiff must establish that 'but for' defendant's acts or omissions, the decedent would not have died." *Friday v. McClure*, 536 S.W.3d 235, 239 (Mo. App. W.D. 2017) (quoting *Brown v. Bailey*, 210 S.W.3d 397, 407 (Mo. App. E.D. 2006)).[7] "Causation is established through

---

[6] This claim was included in both close of the evidence directed verdict motions and the motion for JNOV, or in the alternative, new trial.

[7] The instructions in this case properly submitted the issue of liability on the grounds that "directly caused or directly contributed to cause damage to plaintiff."

expert testimony that there is a reasonable degree of medical or scientific certainty that but for the tortfeasor's conduct, the injured party would not have been damaged." *Lowe v. Mercy Clinic E. Cmtys.*, 592 S.W.3d 10, 18 (Mo. App. E.D. 2019).

Viewing the evidence in the light most favorable to the jury's verdict, it is clear Plaintiffs made a submissible case and established "but for" causation. Two expert witnesses testified, with reasonable medical certainty, that Dr. Killion's and Dr. Rankin's negligence caused or contributed to cause Decedent's death. There was sufficient evidence to support the jury's conclusion that MDMC's conduct caused or directly contributed to Decedent's death. The jury could have concluded reasonably that, but for the negligent acts committed, Decedent would have not undergone the subsequent extensive medical procedures and ultimately died. There is no requirement a plaintiff must submit evidence of when he or she would have died but for the negligent acts that precipitated his or her death.

The circuit court did not err in overruling MDMC's motions for directed verdict and JNOV. This point is denied.

---

[A] causation analysis should not lose sight of the ultimate issue: ... under MAI we do not use the terms 1) "proximate cause," 2) "but for causation," or 3) "substantial factor" when instructing the jury. We merely instruct the jury that the defendant's conduct must "directly cause" or "directly contribute to cause" plaintiff's injury.

*Sanders*, 364 S.W.3d at 208 n.11 (alterations in original) (citing *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 555 (Mo. banc 2008)).

## Expert Witness Qualification

MDMC asserts the circuit court erred in permitting Dr. Thomas Vitale (hereinafter, "Dr. Vitale") to testify at trial. MDMC claims Dr. Vitale was not a qualified expert because he had not practiced actively within five years. MDMC believes it should be granted a new trial to remedy this erroneous admission of testimony.

"The circuit court is granted considerable discretion in deciding whether to admit or exclude evidence." *Williams*, 568 S.W.3d at 416.[8] Absent a clear abuse of discretion, the circuit court's admission of expert testimony will not be disturbed. *J.J.'s Bar & Grill, Inc. v. Time Warner Cable Midwest, LLC*, 539 S.W.3d 849, 871 (Mo. App. W.D. 2017). "The circuit court is uniquely positioned to evaluate the testimony of witnesses and determine its prejudicial impact when prompted by a timely objection." *Shallow v. Follwell*, 554 S.W.3d 878, 885 (Mo. banc 2018).

Again, this Court first must determine whether MDMC preserved its claim of error regarding the admission of Dr. Vitale's testimony at trial. MDMC asserts this claim was

---

[8] MDMC argues the determination as to whether Dr. Vitale's testimony should have been admitted should be reviewed *de novo* because Dr. Vitale does not meet the requirements for a medical expert in section 538.225, RSMo 2016, citing *Lozano v. BNSF Railway Co.*, 421 S.W.3d 448, 451 n.2 (Mo. banc 2014), for this proposition. *Lozano* rebuts the assertion that expert testimony is subject to *de novo* review, stating, "This is not correct." *Id*. "Statutory interpretation is a question of law, which is subject to *de novo* review on appeal." *Lin*, 594 S.W.3d at 241 (quoting *Hervey*, 379 S.W.3d at 163). Section 538.225, RSMo 2016, sets forth the requirements for a health care provider's affidavit certifying the merits of a case when the original petition is filed. MDMC is not challenging the interpretation of section 538.225, RSMo 2016; it attempts only to graft the initial affidavit requirement of whether a case has merit onto the circuit court's determination as to whether a witness may testify at trial.

preserved properly because it objected to Dr. Vitale's testimony at trial and the circuit court was informed fully about its objection because it referenced its prior motion in limine. MDMC further asserts it preserved its objection to Dr. Vitale's testimony because it objected before Dr. Vitale testified, after he offered his testimony relating to his qualifications, and after he summarized Decedent's care. MDMC then requested a continuing objection for the remainder of Dr. Vitale's testimony.

MDMC's assertions of when it objected distorts the factual record on appeal. Prior to trial, MDMC filed multiple motions in limine. In one motion in limine, MDMC challenged Dr. Vitale's qualifications to testify at trial because he did not meet the statutory requirements of section 538.225, RSMo 2016. This motion was overruled. At trial, Dr. Vitale testified extensively about his education, experience, certifications, privileges, and heading peer review committees. Dr. Vitale also testified about Decedent's medical history as well as explaining procedures Decedent underwent and some opinions about Decedent's treatment. Then, MDMC objected.[9]

> [MDMC'S COUNSEL]: Your honor, I would like to renew my objection from the original Motion in Limine.
>
> THE COURT: Which number was that?
>
> [MDMC's COUNSEL]: On the qualification.
>
> THE COURT: I will overrule the objection. Go ahead, sir.

---

[9] Dr. Vitale testified for approximately fifty-six pages in the transcript prior to MDMC's objection.

18

A ruling on a motion in limine "is interlocutory only and is subject to change during the course of the trial." *Smith*, 410 S.W.3d at 636 (quoting *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992)). "A motion in limine, by itself, preserves nothing for appeal." *Hancock v. Shook*, 100 S.W.3d 786, 802 (Mo. banc 2003). After the overruling of a motion in limine, to preserve an evidentiary issue for appeal, "a party is required to object at trial to the introduction of the evidence and reassert the objection in post-trial motions." *Rosales v. Benjamin Equestrian Ctr., LLC*, 597 S.W.3d 669, 686 (Mo. App. W.D. 2019).

"To properly preserve a challenge to the admission of evidence, the objecting party must make a specific objection to the evidence at the time of its attempted admission." *Shallow*, 554 S.W.3d at 884 n.2 (quoting *St. Louis Cnty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 125 (Mo. banc 2013)). The objection to the evidence must be specific. *Brown v. Brown*, 530 S.W.3d 35, 44 (Mo. App. E.D. 2017). By presenting a specific objection, a party ensures the circuit court is apprised of the rationale for the objection and may make an informed ruling. *Id.*

MDMC neither timely objected at trial nor made a specific objection during Dr. Vitale's testimony. MDMC's objection at trial was not timely because it was made significantly after Dr. Vitale testified about his background and resume. Dr. Vitale had testified to care Decedent received and explained many of the treatment procedures in detail. MDMC's objection also was not specific. MDMC referenced only "the original motion in limine," but MDMC filed multiple motions in limine prior to trial. Further, when asked to clarify, MDMC stated only it was "on the qualification." MDMC

19

provided no detailed information explaining why Dr. Vitale's qualifications were objectionable. This point was not preserved for this Court's review.

**Exclusion of Expert Testimony**

MDMC claims the circuit court erred in excluding statements made by Plaintiffs' expert witness, Dr. Bruce Garber (hereinafter, "Dr. Garber"). MDMC believes Plaintiffs were unable to demonstrate causation because Dr. Garber was unable to pinpoint a date or time wherein Decedent would have died.

"The circuit court 'enjoys considerable discretion in the admission or exclusion of evidence.'" *Shallow*, 554 S.W.3d at 881 (quoting *Lozano*, 421 S.W.3d at 451). "In determining whether the trial court abused its discretion in excluding evidence, the focus is not on whether the evidence was admissible but on whether the trial court abused its discretion in excluding the evidence." *Coyle v. City of St. Louis*, 408 S.W.3d 281, 289 (Mo. App. E.D. 2013) (quoting *Arrington v. Goodrich Quality Theaters, Inc.*, 266 S.W.3d 856, 864 (Mo. App. S.D. 2008)).

"To show causation in any wrongful death case, a plaintiff must show that the negligence of the defendant 'directly cause[d]' or 'directly contribute[d] to cause' the patient's death." *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 306 (Mo. banc 2011) (alterations in original) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863 (Mo. banc 1993)). There is no requirement that a plaintiff must present evidence that predicts how long a patient would have lived but for the defendant's negligence. The circuit court did not abuse its discretion in excluding Dr. Garber's statements that he could not predict when Decedent would have died. Point denied.

20

**Deposition Testimony**

MDMC raises two related allegations of error. MDMC asserts the circuit court erred in permitting Plaintiffs' counsel to comment upon MDMC's retained expert, Dr. Mark Schoenberg (hereinafter, "Dr. Schoenberg"), being paid during *voir dire*. MDMC also claims the circuit court erred in permitting Plaintiffs to read a portion of Dr. Schoenberg's deposition into evidence during trial.

*Voir Dire*

A circuit court has broad discretion in determining the appropriateness of questions during *voir dire*. *In re Care & Treatment of D.N.*, 598 S.W.3d 108, 115 (Mo. banc 2020). The party alleging the circuit court "abused its discretion during *voir dire* 'has the burden of showing a real probability that [it] was thereby prejudiced.'" *Dieser v. St. Anthony's Med. Ctr.*, 498 S.W.3d 419, 436 (Mo. banc 2016) (quoting *State v. Nicklasson*, 967 S.W.2d 596, 608 (Mo. banc 1998)).

MDMC claims it is entitled to a new trial because of Plaintiffs' statement Dr. Schoenberg was "one of their experts." However, MDMC takes Plaintiffs' isolated phrase out of context to argue this created an adverse inference that prejudicially influenced the jury. In context of Plaintiffs' *voir dire* questioning, Plaintiffs explained they were trying to determine whether any members of the panel had a bias toward paid expert witnesses and because MDMC had asked in depositions of other expert witnesses how much they were paid. Plaintiffs listed the names of six doctors, including Dr. Schoenberg, and indicated how much money expert witnesses can earn from

21

testifying. MDMC believes this created an adverse inference because MDMC was not planning to call Dr. Schoenberg as a witness.

MDMC claims any argument or evidence about an expert witness that is not going to be called to testify is prohibited. MDMC cites multiple cases that determined the circuit court did not abuse its discretion in excluding evidence of potential expert witnesses. Those cases are inapposite to the facts in this case, and there was no guidance as to what sort of admission would result in an abuse of discretion. The circuit court has been found to not abuse its discretion in admitting an opposing party's witness' interrogatory answers when there is no commentary on the failure of that party to call the witness. *Porter v. Toys 'R' Us-Del., Inc.*, 152 S.W.3d 310, 319 (Mo. App. W.D. 2004). Yet, a circuit court may abuse its discretion when a witness is available to both parties and it allows one party to argue an adverse inference from failing to call that witness. *See Kampe v. Colom*, 906 S.W.2d 796, 801-03 (Mo. App. W.D. 1995) (finding the statements, "[The witness] never came in and testified …. Why didn't they call [the witness]? Because [the witness] would not help them in this case" to be an improper adverse inference argument).

Plaintiffs never made any sort of comment about Dr. Schoenberg's failure to testify. MDMC does not allege Dr. Schoenberg was equally available to both parties, nor does it attempt to demonstrate how it was prejudiced. There was no abuse of discretion.

*Admission at Trial*

MDMC states the circuit court erred in allowing Plaintiffs' counsel to read a portion of Dr. Schoenberg's deposition to the jury. MDMC argues it objected to this evidence.

"To properly preserve a challenge to the admission of evidence, the objecting party must make a specific objection to the evidence at the time of its attempted admission." *City of Aurora v. Spectra Commc'n Grp., LLC*, 592 S.W.3d 764, 797 (Mo. banc 2019) (quoting *River Bend Estates*, 408 S.W.3d at 125). MDMC objected as follows:

> [PLAINTIFFS' COUNSEL]: Your Honor, at this time Plaintiff[s are] going to read a portion of the deposition of Dr. Mark Schoenberg for the jury.
>
> [MDMC'S COUNSEL]: Your Honor, just renew my objections.
>
> THE COURT: Yes. I sustained that objection earlier.

MDMC's statement, "just renew my objections," was not a specific objection. Accordingly, this issue is not preserved for appeal because it leaves this Court without any guidance as to MDMC's objections.[10] Point denied.

---

[10] Due to the circuit court's statement it sustained that objection, a reasonable inference may be that MDMC was attempting to reference its prior motion in limine to exclude portions of Dr. Schoenberg's deposition. By referring back to that motion in limine in the record about Dr. Schoenberg's deposition, MDMC did request the circuit court prohibit specific portions of Dr. Schoenberg's deposition from being read into evidence. However, MDMC did not request the portion of Dr. Schoenberg's deposition wherein he states how much money he was paid to be excluded. The circuit court "does not commit error when it grants all the relief requested." *State v. Hightower*, 511 S.W.3d 454, 462 (Mo. App. E.D. 2017).

23

## Conclusion

The circuit court's judgment is affirmed.

_____
GEORGE W. DRAPER III, Chief Justice

Breckenridge and Stith, JJ., concur; Powell, J.,
concurs in result in separate opinion filed;
Wilson, J., dissents in separate opinion filed;
Fischer, J., dissents in separate opinion filed;
Russell, J. concurs in opinion of Powell, J.

24



# SUPREME COURT OF MISSOURI
## en banc

JOHN HENRY RHODEN and            )
DOROTHY JEAN WINFIELD,           )
                                 )
                    Respondents, )
                                 )
v.                               )        No. SC98327
                                 )
MISSOURI DELTA MEDICAL CENTER,   )
                                 )
                    Appellant.   )

### CONCURRING OPINION

I concur in the result reached in the principal opinion. Considering the evidence under the appropriate standard of review as cited by the principal opinion, there was evidence suggesting Dr. Linza Killion's post-surgery conduct constituted reckless indifference to—or conscious disregard of—Rhoden's wellbeing and was "tantamount to intentional wrongdoing." *Sharp v. Robberson*, 495 S.W.2d 394, 397 (Mo. banc 1973). The requisite punitive damages standard of demonstrating "willful, wanton or malicious misconduct," therefore, was met. § 538.210.8, RSMo Supp. 2017. I write separately however, to underscore that punitive damages are rarely recoverable in negligence actions, as Judge Wilson's dissenting opinion connotes. *See also Dodson v. Ferrara*, 491 S.W.3d

542, 563 (Mo. banc 2016).  Litigants should proceed cautiously when considering submitting punitive damages in future negligence actions and should reserve such submissions for the truly extraordinary cases.  After overruling defendant Missouri Delta Medical Center's motion for a directed verdict on the issue of the submissibility of punitive damages, the distinguished trial judge in this matter aptly noted, "pigs get fat[,] and the hogs are going to get slaughtered."  Future litigants should heed the circuit court's warning.

_____
W. Brent Powell, Judge



# SUPREME COURT OF MISSOURI
## en banc

JOHN HENRY RHODEN and  )
DORTHY JEAN WINFIELD,  )
                                                        )
             Respondents,  )
                                                        )
v.  )        No. SC98327
                                                         )
MISSOURI DELTA MEDICAL CENTER,  )
                                                        )
             Appellant.  )

## DISSENTING OPINION

Punitive damages are "intended to punish or deter willful, wanton or malicious conduct …." § 538.205(10).[1] Therefore, punitive damages are available only when plaintiffs show by clear and convincing evidence that "the healthcare provider demonstrated willful, wanton or malicious misconduct…." § 538.210.8. As the principal opinion notes, "'For purposes of punitive damages, acting willfully, wantonly, or maliciously is equivalent to acting with a complete indifference to or in conscious disregard for the rights or safety of others.'" *Slip op.* at 6 (quoting *Bell v. Redjal*, 569 S.W.3d 70, 89 (Mo. App. 2019)).

---

[1] All statutory references are to RSMo Supp. 2017 unless otherwise noted.

Punitive damages "are not generally recoverable in negligence actions because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." *Dodson v. Ferrara*, 491 S.W.3d 542, 563 (Mo. banc 2016) (citation omitted). "But an act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was ***intentionally inflicted***." *Sharp v. Robberson*, 495 S.W.2d 394, 397 (Mo. banc 1973) (emphasis added). This is because the defendant's reckless indifference to – or conscious disregard of – a very high risk of harm is "***tantamount to intentional wrongdoing***.'" *Id.* (emphasis added). *See Hoover's Dairy, Inc., v. Mid-Am. Dairymen, Inc./Special Prods., Inc.*, 700 S.W.2d 426, 436 (Mo. banc 1985) (explaining punitive damages are submissible when defendant knows "or had reason to know that there was a high degree of probability that the action ***would result*** in injury") (emphasis added in part and omitted in part) (citations omitted).[2] In *Hoover's Dairy*, this Court explained how high this bar is, and should be:

> The comments to [Restatement (Second) of Torts] § 500 makes [sic] it clear that the actor must either know or have reason to know that his or her act is substantially likely to cause physical harm. Perhaps the classic example is of an individual firing a rifle into a moving passenger train. There, the actor either knows or has reason to know that there is an unreasonable risk that a passenger will be hit.

---

[2] *See also Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 160 (Mo. banc 2000) ("[D]efendant's conduct must be tantamount to intentional wrongdoing where the ***natural and probable consequence*** of the conduct is injury.") (emphasis added); *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 339 (Mo. banc 1996) (Defendant "must be conscious of his conduct, and, [though] having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct ***will naturally or probably result in injury***.") (quoting *Hoover's Dairy*, 700 S.W.2d at 435) (alteration in original) (emphasis omitted in part).

700 S.W.2d at 435-36 (citing W. Prosser & W. Keeton, Prosser & Keeton on Torts, §§ 9-10, 212-14).

Dr. Killion's decision to recommend surgery and his performance of that surgery were negligent, perhaps even grossly so, but it cannot be said they were "tantamount to intentional wrongdoing." Plaintiffs suggest the decision to proceed to surgery warranted punitive damages because other options were available. But this merely constitutes a classic allegation of negligence in the context of a medical malpractice case. Plaintiffs cannot credibly suggest that the "natural and probable consequence" of the decision to proceed to surgery was death or that this decision presented such a high risk of Mr. Rhoden's death so as to justify the law treating Dr. Killion as though he intended that outcome.

Similarly, by resecting too much prostate tissue during the transurethral resection of the prostate ("TURP") surgery, Dr. Killion certainly was negligent and may well have been grossly so. But this does not mean his surgical mistakes were "tantamount to intentional wrongdoing." When Dr. Killion noticed a "shelf" in Mr. Rhoden's prostate, he conducted a transurethral resection of the bladder neck ("TUIBN"). Plaintiffs' expert, Dr. Garber, criticized Dr. Killion's decision to conduct a TUIBN, but no evidence suggests (let alone clearly and convincingly establishes) that the "natural and probable" result of the TUIBN was the death of the patient or that Dr. Killion's actions demonstrated complete indifference to (or a conscious disregard of) a very high risk that Mr. Rhoden would die as a result.

3

The decisions following Mr. Rhoden's TURP surgery also were mere negligence, not "tantamount to intentional wrongdoing." When Mr. Rhoden complained of significant pain in his abdomen following that surgery, Dr. Killion concluded it was normal post-operative pain and prescribed medication. When the pain persisted, X-rays were ordered and showed free air in Mr. Rhoden's chest cavity. The radiologist suspected this was post-operative in nature. Dr. Said contacted Dr. Rankin to perform a surgical consultation and evaluation. Dr. Rankin believed the free air was caused by a perforated viscus, but he did not suspect a perforated bladder because he did not see Dr. Said's note suggesting that Mr. Rhoden may have had a urine leak. Dr. Rankin conducted an exploratory laparotomy to diagnose the cause of the free air. He believed a laparotomy to be the best diagnostic tool because, if the cause was a perforated viscus, he would need to conduct surgery anyway, allowing him to save time between diagnosis and surgery. The laparotomy, however, did not allow Dr. Rankin to see the underside of the bladder, and, because of the inability to see the underside of the bladder, Dr. Rankin did not see the catheter was outside the bladder.

Plaintiffs argue the doctors should have ordered a CT scan instead of the laparotomy and a CT scan would have shown the catheter was outside the bladder. Even assuming this constituted negligence, Plaintiffs cannot credibly contend that death was the "natural and probable" result of the decision to choose a laparotomy rather than a CT scan under these circumstances, that this decision was "tantamount to intentional wrongdoing," or that it demonstrated complete indifference to (or a conscious disregard of) a very high risk that Mr. Rhoden would die as a result of that decision. Similarly, the

4

fact that Dr. Killion did not reinsert himself to change this and other post-operative decisions was negligence but falls far short of the standard this Court historically has applied to control the submissibility of punitive damages.

In the end, "[p]unitive damages 'are imposed for the purpose of punishment and deterrence.'" *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996) (quoting *State ex rel. Smith v. Greene,* 494 S.W.2d 55, 60 (Mo. banc 1973)). Limiting punitive damages to cases involving intentional wrongdoing or conduct so egregious that it is "tantamount" to such conduct furthers these goals. Allowing punitive damages for what is – and, until this case, always has been – mere negligence does not.

_____
Paul C. Wilson, Judge

5


JOHN HENRY RHODEN and
DOROTHY JEAN WINFIELD,

)
)
)

    Respondents,

)
)

v.

)
)

No. SC98327

MISSOURI DELTA MEDICAL CENTER,

)
)
)

    Appellant.

)

**DISSENTING OPINION**

  I respectfully dissent from the principal opinion's conclusion that MAI 10.07's "complete indifference or conscious disregard" standard for punitive damages is equivalent to §§ 538.205's and 538.210's "willful, wanton or malicious misconduct" standard.[1] In my view, the General Assembly, in 1986, intended to modify the general punitive damages standard set out in MAI 10.07 to require a higher standard for punitive damages claims against health care providers. Therefore, the circuit court erred in giving MAI 10.07 because it was an incorrect statement of the substantive law. *See Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 376 (Mo. banc 2014).

---

[1] "[W]illful, wanton, or malicious misconduct" is no longer the standard for punitive damages for claims against health care providers. *See* §§ 538.205 and 538.210, RSMo Supp. 2020.

In pertinent part, MAI 10.07 requires the jury to find the "defendant thereby showed complete indifference to or conscious disregard for the safety of others" to award punitive damages. This "complete indifference or conscious disregard" standard reflects the "general standard for the award of punitive damages . . . developed in Missouri cases between 1973 and 1985." *Koon v. Walden*, 539 S.W.3d 752, 776 (Mo. App. 2017) (Odenwald, J., concurring); *see also Hoover's Dairy*, *Inc. v. Mid-Am. Dairymen*, *Inc.*, 700 S.W.2d 426, 435 (Mo. banc 1985); *Sharp v. Robberson*, 495 S.W.2d 394, 398-99 (Mo. banc 1973). But, in 1986, the General Assembly enacted chapter 538, titled "Tort Actions Based on Improper Health Care."[2] In chapter 538, the General Assembly defined "punitive damages" as "damages intended to punish or deter willful, wanton or malicious misconduct." § 538.205(10), RSMo 1986. Similarly, the General Assembly enacted § 538.210, which provided:

> [A]n award of punitive damages against a health care provider . . . shall be made only upon a showing by a plaintiff that the health care provider demonstrated willful, wanton or malicious misconduct with respect to his actions which are found to have injured or caused or contributed to cause the damages claimed in the petition.

Section 538.210.5, RSMo 1986.

It is well-established the General Assembly may supplant the common law by statutory enactment. *Estate of Williams v. Williams*, 12 S.W.3d 302, 307 (Mo. banc 2000); *L.E. Lines Music Co. v. Holt*, 60 S.W.2d 32, 34 (Mo. 1933). Additionally, this Court presumes the General Assembly legislates with knowledge of existing laws, rules, and

---

[2] Chapter 538 repealed §§ 383.105 and 383.110, RSMo 1978.

instructions as well as court opinions interpreting and applying those existing laws, rules, and instructions. *Roesing v. Dir. of Revenue*, 573 S.W.3d 634, 639 (Mo. banc 2019); *Hillyard v. Hutter Oil Co.*, 978 S.W.2d 75, 79-80 (Mo. App. 1998); *City of Springfield v. Coffman*, 979 S.W.2d 212, 214 (Mo. App. 1998).

Prior to 1986, the General Assembly had not specified a separate standard for punitive damages in tort actions against health care providers. Because the common law remains intact until abrogated by the General Assembly, *L.E. Lines Music*, 60 S.W.2d at 34, it is fair to say the general "complete indifference or conscious disregard" standard applied to punitive damages claims against health care providers until the 1986 enactment. Well aware of this general, less culpability "complete indifference or conscious disregard" standard, and of this Court's numerous cases applying that standard, the General Assembly declined to include it in chapter 538. Instead, the General Assembly limited punitive damage claims against health care providers to claims rising to the level of "willful, wanton or malicious misconduct."

In my view, the General Assembly's intent could not have been clearer: the less culpable standard of "complete indifference or conscious disregard" for punitive damages no longer applied to claims against health care providers. Nevertheless, our court of appeals failed to recognize the intentional modification to the common law and, perhaps counterintuitively, held the two standards are equivalent. *Koon*, 539 S.W.3d at 772; *Bell v. Redjal*, 569 S.W.3d 70, 89 (Mo. App. 2019).[3] This failure in recognition by the court of

---

[3] Until today, this Court had not been called upon to answer this question because the issue had never been preserved for this Court's review. *See Dodson v. Ferrara*, 491 S.W.3d 542, 563 n.13

appeals led the General Assembly to further clarify its intent by amending §§ 538.205 and 538.210 earlier this year.

"Legislative changes to existing law are highly instructive as to a statute's meaning." *Missouri State Conf. of NAACP v. State*, 607 S.W.3d 728, 734 (Mo. banc 2020). As of August 28, 2020, § 538.210 provides in pertinent part:

> Any provision of law or court rule to the contrary notwithstanding, an award of punitive damages against a health care provider governed by the provisions of sections 538.205 to 538.230 shall be made only upon a finding by the jury that the evidence clearly and convincingly demonstrated that the health care provider intentionally caused damage to the plaintiff or demonstrated malicious misconduct that caused damage to the plaintiff. ***Evidence of negligence including, but not limited to, indifference to or conscious disregard for the safety of others shall not constitute intentional conduct or malicious misconduct.***

Section 538.210.8, RSMo Supp. 2020 (emphasis added). Because our intermediate appellate court failed to recognize the change to the common law, the General Assembly has made it even more clear[4] "punitive damages"—as that term is used in a tort claim against a health care provider—are "damages intended to punish or deter malicious misconduct or conduct that intentionally caused damage to the plaintiff, including exemplary damages and damages for aggravating circumstances." § 538.205(11), RSMo Supp. 2020. The General Assembly's chosen text leaves no doubt it intended "complete indifference or conscious disregard"—the standard generally applicable to causes of action

---

(Mo. banc 2016) ("Defendants provide no reason why a claim for aggravating circumstances damages under chapter 538 should be analyzed differently from other wrongful death claims, ***nor do they dispute the standard for punitive damages or aggravating circumstance damages as set forth in . . . MAI 10.07***[.]" (emphasis added)).

[4] Like Lieutenant Daniel Kaffee, some might conclude "crystal" clear. A FEW GOOD MEN (Columbia Pictures 1992) (available at https://www.youtube.com/watch?v=KmKOVdAGtzM).

against defendants other than health care providers—to be understood as a different, lesser, standard than willful, wanton, or malicious misconduct—which applies to claims for punitive damages against health care providers.

The General Assembly often amends statutes for the purpose of clarification as opposed to changing existing statutory law. *State ex rel. Hillman v. Beger*, 566 S.W.3d 600, 607 (Mo. banc 2019); *Mid-Am. Television Co. v. State Tax Comm'n of Mo.*, 652 S.W.2d 674, 679 (Mo. banc 1983).[5]  In my view, the General Assembly's August 2020 amendments were obviously intended to make crystal clear its original intent in enacting chapter 538 in 1986: That is, to modify the common law standard for punitive damages claims against health care providers and to provide a different, and higher, standard than MAI 10.07's general standard, which applies to claims for punitive damages made against any defendant other than health care providers.

_____<br>
Zel M. Fischer, Judge

---

[5] Courts have correctly determined the General Assembly intended a clarification, as opposed to a change, when the General Assembly alters already existing statutes. *Hillman*, 566 S.W.3d at 607-08; *State v. McGirk*, 999 S.W.2d 298, 301 (Mo. App. 1999); *Osage Outdoor Advert., Inc. v. State Highway Comm'n of Mo.*, 699 S.W.2d 791, 793-94 (Mo. App. 1985).